IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

---

| | |
|---|---|
| ROGER GRANGUILLHOME,<br>TOMMY D. BURLEIGH,<br>ANTHONY BECKWITH,<br><br>    Plaintiffs,<br><br>    v.<br><br>UTAH BOARD OF PARDONS et al.,<br><br>    Defendants. | Lead Case   2:04-CV-260 TC<br>Member Case 2:04-CV-297<br>Member Case 2:04-CV-303<br><br><br>O R D E R  and<br>M E M O R A N D U M<br>D E C I S I O N |

---

Plaintiffs, inmates at the Utah State Prison and Purgatory Correctional Facility, filed this pro se civil rights action under 42 U.S.C. § 1983.  *See* 42 U.S.C.A. § 1983 (West 2006).  On August 25, 2005, the court dismissed numerous claims and Defendants, leaving only Plaintiffs' claims for prospective injunctive relief against the Utah Board of Pardons and Parole. This case is now before the court on Defendant's motion to dismiss the remaining claims.

**ANALYSIS**

**I. Summary Judgment Standard of Review**

Defendant's motion to dismiss is supported by numerous affidavits, exhibits, and other supporting documents.  Rule 12(b) provides that if, on a motion to dismiss under Rule 12(b)(6), "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary

judgment," and the parties must be given a reasonable opportunity
to present all "pertinent" materials.  Fed. R. Civ. P. 12(b).
Plaintiffs have had ample opportunity to properly respond to
Defendant's motion by presenting pertinent rebuttal evidence.
Accordingly, the court will treat Defendant's motion for
dismissal as one for summary judgment under Rule 56.

Summary judgment is appropriate when "there is no genuine
issue as to any material fact and . . . the moving party is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).
The moving party bears the initial burden of showing "that there
is an absence of evidence to support the non-moving party's
case."  *Celotex v. Catrett, 477 U.S. 317, 325 (1986)*.  This
burden may be met merely by identifying portions of the record
which show an absence of evidence to support an essential element
of the opposing party's case.  *Johnson v. City of Bountiful, 996
F. Supp 1100, 1102 (D. Utah 1998)*.

Once the moving party satisfies its initial burden, "the
burden then shifts to the nonmoving party to make a showing
sufficient to establish that there is a genuine issue of material
fact regarding the existence of [the disputed] element."  *Id.*
Federal Rule of Civil Procedure 56(e) requires a nonmovant "that
would bear the burden of persuasion at trial" to "go beyond the
pleadings and 'set forth specific facts' that would be admissible
in evidence in the event of a trial from which a rational trier

2

of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, 144 F.3d 664, 671 (10th Cir. 1998)*.  The specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling, 968 F.2d 1022, 1024 (10th Cir. 1992)*.  Mere allegations and references to the pleadings will not suffice.  However, the court will "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999)*.

## II. Background

The original complaints in these consolidated cases named as defendants the Utah Board of Pardons and Parole (Board), and the individual members of the Board in both their official and individual capacities.  The complaints sought prospective injunctive relief and compensatory and punitive damages based on the Board's alleged religious discrimination in making treatment recommendations and parole determinations.  On screening under 42 U.S.C. § 1915A(b), the court found that the Board members in their individual and official capacities were absolutely immune from suit, and that the Board itself was immune from damages claims under the Eleventh Amendment.  However, the court concluded that Plaintiffs could proceed with their claim for prospective injunctive relief against the Board, subject to the

limitations of the *Ex parte Young* doctrine.[1]  *See Ex parte Young, 209 U.S. 123, 158-159, 28 S. Ct. 441, 454 (1908)*.  The court ordered official service of process on the Board which responded with the present motion to dismiss.

Plaintiffs' remaining claims allege that the Board's practices violate the Religion Clauses and Equal Protection Clause of the U.S. Constitution.  Plaintiffs allege that the Board gives preferential treatment to inmates convicted of sexual offenses who are members of The Church of Jesus Christ of Latter-day Saints (LDS Church).  To support their claims, Plaintiffs allege that statistically LDS sex offenders receive earlier original parole hearings and referrals to Sex Offender Treatment (SOT), and that they ultimately serve less time on their sentences than non-LDS sex offenders before being paroled.  Plaintiffs also point to one specific case in which a Board member allegedly questioned an inmate about his religious beliefs and desire to serve an LDS mission if paroled; Plaintiffs allege that this incident shows that the Board routinely considers inmates' religious beliefs when making parole decisions.

Plaintiffs seek an injunction prohibiting the Board from

---

[1] The *Ex parte Young* doctrine states that, in a suit against a state official, "when a party seeks only prospective equitable relief--as opposed to any form of money damages or other legal relief--then the Eleventh Amendment generally does not stand as a bar to the exercise of the judicial power of the United States." *ANR Pipeline Co. v. Lafaver, 150 F.3d 1178, 1188 (10th Cir. 1998)*.

considering an inmate's religious affiliation when making parole
decisions or treatment recommendations.   Plaintiffs also ask the
court to exercise plenary judicial review over all Board
procedures and decisions by formulating and enforcing "binding
rules and guidelines" governing all aspects of the Board's
operations.

### III. Free Exercise

Construed liberally, Plaintiffs' complaint asserts that the
Board's allegedly discriminatory practices impair the free
exercise of non-LDS religions as prohibited under the First
Amendment.   Although Plaintiffs do not specifically refer to the
Free Exercise Clause in their complaint, they generally allege
that the Board's practices are "an attempt to sway or influence
an offender's support and involvement in his own religion."
(Compl. at 2.)   Plaintiffs further allege that "the board has
violated Plaintiff[s'] right to be free from all governmental
coercion, whether direct or indirect, to support any religion
Plaintiff[s] choose[] of [their] own free will to support."
(Compl. at 7.)

### A. Standard of Review

Under the Free Exercise Clause of the First Amendment, which
has been made applicable to the States by incorporation into the
Fourteenth Amendment, *see* *Cantwell v. Connecticut*, 310 U.S. 296,
303, 60 S. Ct. 900, 903 (1940), "government may not compel

affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma." *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 (1990)(internal citations omitted).

Plaintiffs' complaint also invokes the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C.A. § 2000bb-1, which mandated "strict scrutiny" of any government action which substantially burdened any person's exercise of religion. *See* 42 U.S.C.A. § 2000bb-1 (West 2006). Although the RFRA was struck down by the Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157 (1997), comparable protections for incarcerated persons have since been reenacted in the Religious Land Use and Institutionalized Persons Act (RLUIPA). *See* 42 U.S.C.A. § 2000cc-1 (West 2006). Because Plaintiffs are now, or were at the time of filing this action, "confined to an institution" which receives federal funding, as required under RLUIPA, *see id.* § 2000cc-1(b)(1), the court will apply the RLUIPA standard of review to Plaintiffs' free exercise claim.

Section 3 of RLUIPA states that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . ., even if the burden results from a rule of general applicability, unless the

> government demonstrates that imposition of the burden
> on that person--(1) is in furtherance of a compelling
> governmental interest; and (2) is the least
> restrictive means of furthering that compelling
> governmental interest.

*Id.* § 2000cc-1(a). Under the RLUIPA framework, the plaintiff

bears the initial burden of "produc[ing] prima facie evidence to

support a claim alleging a violation of the Free Exercise Clause

. . . ." *Id.* § 2000cc-2(b). Once the plaintiff satisfies its

burden, then "the government shall bear the burden of persuasion

on any element of the claim, *except* that the plaintiff shall bear

the burden of persuasion on whether the . . . government practice

that is challenged by the claim substantially burdens the

plaintiff's exercise of religion." *Id.* (emphasis added).

### B. Plaintiffs' Prima Facie Evidence

Plaintiffs rely on three primary strategies to support their

argument that the Board purposefully discriminates on the basis

of religion. First, Plaintiffs have attempted to identify a

number of non-party LDS sex offenders who Plaintiffs assert are

otherwise similarly situated to Plaintiffs, but who allegedly

received more favorable treatment from the Board. Plaintiffs

argue that this demonstrates a bias in favor of LDS offenders

that encourages membership or participation in the LDS church

over other religions. Second, Plaintiffs have identified one

specific case in which a Board member questioned an inmate, Shonn

Ricks, about his understanding of LDS doctrine, and his desire to

serve a religious mission for the LDS Church if released on parole.  Plaintiffs argue that the Board's decision to terminate Ricks' sentence was based on his religious beliefs, which amounts to an endorsement of the LDS religion.  Finally, Plaintiffs point to alleged statistical data which they argue shows that LDS offenders generally serve less time on their sentences than non-LDS offenders before being paroled.

### i. Non-Party Cases

Plaintiffs unpersuasively attempt to make out a free exercise claim by selectively comparing cases where LDS offenders received what Plaintiffs consider favorable treatment, to cases in which non-LDS offenders received less favorable outcomes.  The record shows that in most cases the Board is not even aware of an inmate's religious affiliation, unless that information is either directly relevant to the inmate's offense, or is raised by the inmate himself--for instance, by participation in religion-based programs, or through letters of recommendation from religious leaders.  (Blanchard Aff. at 2.)  Although the "Face Sheet" on each inmate's file contains a box for specifying their religion, this information is not always provided, and in many cases simply identifies the inmate's religion as "Unknown."  (Def.'s Mem. Supp. Ex. 20.)

The uncontroverted affidavits of each Board member attest that religious affiliation or participation is not considered in

making parole decisions, except as previously noted, and even then, it is merely one of a multitude of factors relevant to the Board's determination. (Blanchard Aff. at 4.) There is also no evidence that religion was a significant factor in the Board's decisions regarding Plaintiffs. The record shows that of the three Plaintiffs to this suit religion came up during the parole hearings of only one, Roger Granguillhome. In that case, the Board's file indicated that Granguillhome was acting as a pastor for the Church of God at the time he committed his offense, and that Granguillhome's victim was a young parishioner who had come to him for help with family problems. Although the Board considered the fact that Granguillhome occupied a position of trust as a pastor at the time of his offense, Defendant asserts that was just one of a multitude of factors considered in deciding his case. Defendant asserts that Granguillhome's case is typical of how an inmate's religious involvement may sometimes come up during the Board's decision making process. However, Defendant denies that Granguillhome's religion was a factor in deciding his case.

Defendant has submitted reams of documents detailing its review process and the reasons for its decisions in each of the Plaintiffs' cases and also each of the non-party cases cited by Plaintiffs. The record shows that in every case cited by Plaintiffs the Board's decisions were well within its discretion,

based on the individual factors presented.  The court was unable
to find any evidence to support Plaintiffs' assertion that
variations in the Board's decisions were based on religion,
rather than a myriad of other benign factors.

The court finds that the evidence related to the Board's
decisions regarding the non-party offenders identified in the
Complaint are insufficient to make out a prima facie case of
religious discrimination.  Those cases do not show that the Board
is routinely aware of offenders' religious preferences, or that
the Board improperly considers religion in reaching its
decisions.  Nor does the evidence regarding Plaintiffs' own cases
support a finding of religious bias.  Although the record shows
that religion may occasionally come up during Board
deliberations, the court finds that such tangential consideration
of religion in no way inhibits the free exercise of religion.

ii. Shonn Ricks Case

Plaintiffs' attempt to support their Free Exercise claim by
pointing to the Ricks case is also unavailing.  To start with,
Plaintiffs have not presented any reliable evidence documenting
what actually occurred in that case.  Instead, Plaintiffs rely
exclusively on a single, uncorroborated, newspaper account of
Ricks' parole hearing and surrounding events.  (Burleigh Opp'n
Mem. Ex. 1)  In addition, Plaintiffs' allegation that Sibbett
admitted he allowed Ricks' affiliation with the LDS Church to

influence his parole decision is not supported by the newspaper's
version of events.  The newspaper article Plaintiffs cite does
not report such an admission by Sibbett.  Instead, it
specifically quotes Sibbett as saying that "[t]he highest issue
[Board members] look at is risk to re-offend."  (Burleigh Opp'n
Mem. Ex. 1 at 4.)

Plaintiffs do not allege, nor is there any evidence in the
record to show, that the Board ever questioned Plaintiffs about
their religious beliefs.  In fact, the Ricks case appears to be
the only case in which a member of the Board directly questioned
an offender about his religion.  And, according to the newspaper
article cited by Plaintiffs, Sibbett later explained that his
questioning was merely "an interview technique designed to give
Ricks a last chance to admit his crime."  (Def.'s Reply Brief to
Granguillhome Opp'n Mem. Ex. 1 at 5.)  Although this isolated
incident is cause for concern, given the plausible explanation
offered by Sibbett, and the lack of evidence showing that such
questioning is routine, the court does not find it sufficient to
make out a prima facie violation of the free exercise clause.

### iii. Statistical Data

Finally, the court finds Plaintiffs' "statistical data" to
be similarly unavailing.  Granguillhome has presented two pages
of statistical data which he alleges come from a "Utah Department
of Corrections Adult Corrections Statistics 'Snapshot' of

inmates." (Granguillhome Opp'n Mem. at 4; Ex. 1.) Granguillhome asserts, without any support, that this data is part of a report issued by the State of Utah which found that LDS inmates served shorter prison terms than non-LDS inmates. Plaintiffs' only attempt to authenticate this document, as required under Rule 901(a) of the Federal Rules of Evidence, is a reference to a web address which is no longer valid.

Not only is Plaintiffs' "statistical data" evidence totally unauthenticated, it is also difficult to decipher and is inconclusive at best. The document provided by Granguillhome consists of only two pages of jumbled figures without any credible explanation or interpretation whatsoever. According to Plaintiffs, these figures list the actual time served by inmates of various races and religions, as compared to a "matrix" figure which purportedly represents how long an offender "should" be incarcerated for a particular crime. There is no indication how this "matrix" figure was derived, or what bearing, if any, it has on the time actually served.

Even if the court were to accept Plaintiffs' reading of this data it would not be sufficient to make out a prima facie showing of religious discrimination. Raw statistical data showing that LDS offenders serve less time on average than inmates of other religions is meaningless by itself. To show purposeful discrimination on the basis of religion the data must account for

numerous factors besides religion that could explain variations in time served.  Plaintiffs have not come forward with any data or supporting evidence to this effect.  Instead, they offer only conjecture and their own hypotheses as to what the limited data means.  Thus, the court finds that the statistical data proffered by Plaintiffs is insufficient to make out a prima facie showing of religious discrimination.

### C. Conclusion

Plaintiffs have failed to satisfy their initial burden of producing prima facie evidence supporting their free exercise claim.  First, the numerous cases of non-party offenders cited by Plaintiffs do not reveal even a single case in which the Board's decision could plausibly be shown to have resulted from religious bias.  Second, the court finds that Plaintiffs' portrayal of the events surrounding the Ricks case is grossly overstated, does not conform with the evidence in the record, and does not support a finding of religious discrimination.  Finally, the court finds that Plaintiffs' promised statistical data showing that LDS offenders routinely receive better treatment from the Board than non-LDS offenders, is not only unauthenticated, but also totally unpersuasive.

Plaintiffs have also failed to satisfy their burden of persuasion on whether the Board's practices substantially burden Plaintiffs' exercise of religion.  The burden alleged by

Plaintiffs is tenuous at best.  Although Plaintiffs make concusory assertions that non-LDS inmates, including Plaintiffs, have been dissuaded from practicing their religion for fear of Board discrimination, there is no evidence in the record to support this allegation.

Thus, the court concludes that even under the strict scrutiny standard required by RLUIPA, based on the record before the court, Defendant is entitled to summary judgment on Plaintiffs' free exercise claim.

### IV. Establishment Clause

Plaintiffs assert that the Board's allegedly discriminatory practices amount to an establishment of the LDS religion prohibited under the First Amendment.  In Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971), the Supreme Court articulated a three-pronged test for determining whether a government action can withstand scrutiny under the Establishment Clause.  First, a challenged government action "must have a secular legislative purpose; second, [the action's] principal or primary effect must be one that neither advances nor inhibits religion; [and,] finally, the [action] must not foster an excessive government entanglement with religion." Id. (internal quotation marks and citation omitted).  If the challenged government action is not found to have a clearly secular purpose no consideration of the second or third criterion is necessary. Wallace v. Jaffree, 472

U.S. 38, 56, 105 S. Ct. 2479 (1985).

A. Secular Purpose

Under the first prong of the *Lemon* test a governmental
action must be invalidated "if it is entirely motivated by a
purpose to advance religion." *Id.* However, "[w]hen the
government professes a secular purpose for an arguably religious
policy, the government's characterization is entitled to some
deference." *Utah Gospel Mission v. Salt Lake City Corp.*, 425
F.3d 1249, 1259 (10th Cir. 2005). Thus, the court "should resist
attributing unconstitutional motives to the government,
particularly where [it] can discern a plausible secular purpose."
Bauchman v. W. High Sch., 132 F.3d 542, 552-53 (10th Cir. 1997).

Plaintiffs appear to argue that the Board's practice of
making individualized parole determinations, based on a number of
factors weighed at the Board's discretion, has no secular
purpose, and is actually intended to give preferential treatment
to LDS offenders in order to encourage others to join the LDS
Church. As previously pointed out, however, Plaintiffs have not
come forward with any evidence to support a finding that the
Board gives preferential treatment to LDS offenders. More
importantly, the Board's practice of making individualized parole
determinations based on a number of relevant factors, rather than
following hard and fast rules as proposed by Plaintiffs, is
clearly supported by a secular purpose. Namely, protecting the

public by ensuring that parole decisions are based foremost on a wide-ranging assessment of the offender's likelihood to re-offend.  Plaintiffs have not presented any evidence which would lead the court to question the validity of this secular purpose.

## B. Primary Effect

Turning to the second prong of the *Lemon* test the court must consider whether the Board's practices "have the principal or primary effect of advancing or endorsing religion." *Id*. at 555. But "not every governmental activity that confers a remote, incidental or indirect benefit upon religion is constitutionally invalid." *Id.*

Plaintiffs allege two means by which the Board has advanced the LDS religion.  First, Plaintiffs allege that the Board terminated the sentence of Shonn Ricks in order to allow him to serve a mission for the LDS Church.  This allegation has been shown to be entirely without merit.  Not only is there no evidence that Ricks' desire to serve an LDS mission influenced the Board's decision in his case, but Ricks reportedly never went on a mission for the LDS Church.  (Def.'s Reply Brief to Granguillhome Opp'n Mem. Ex. 1 at 2.)  Second, Plaintiffs vaguely assert that by giving preferential treatment to LDS offenders, the Board encourages membership or participation in the LDS Church.  Not only have Plaintiffs failed to support their assertion that the Board favors LDS offenders, but there is also

no evidence that the LDS Church has benefitted from the Board's
policies.

### C. Excessive Entanglement

Finally, *Lemon* requires that the court consider whether the
Board's practices "foster an excessive government entanglement
with religion." *Utah Gospel Mission*, 425 F.3d at 1261.
Plaintiffs have not presented any evidence to support their
allegation that the Board routinely delves into offenders'
religious beliefs.  The record shows that in most cases the Board
is completely unaware of an offender's religious affiliation.  As
shown, the Board only notes an offender's religious affiliation
if it has some direct connection with the offender's crime, or if
it is apparent from the offender's recommendation letters or
participation in rehabilitative programs.

Plaintiffs have identified only one case where a Board
member questioned an offender about his religious beliefs, that
being the Shonn Ricks case discussed previously.  There,
according to a newspaper account, Sibbett questioned Ricks
extensively about his religious beliefs and desire to serve an
LDS mission.  However, as Defendant points out, Sibbett also told
the newspaper that "his queries into Ricks' religious beliefs
were an interview technique designed to give Ricks a last chance
to admit his crime."  (Def.'s Reply Brief to Granguillhome Opp'n
Mem. Ex. 1 at 5.)  Defendant admits that Sibbett's "quizzing

Ricks on his religious beliefs was perhaps not the best interview technique." (Defs.' Reply to Burleigh's Resp. Br. at 3.) However, Defendant denies that such questioning is a routine practice for the Board, and argues that this isolated incident is not sufficient to make out an establishment claim. Plaintiffs have not come forward with anything to challenge these assertions.

The court finds that the record here does not show that the Board's practices foster an excessive entanglement with religion. Although the court finds the questioning in the Ricks case troubling, there is no evidence that type of questioning is routine. Instead, the evidence shows that in most cases the Board is totally unaware of the offender's religious affiliations or beliefs, and that the issue of religion normally does not even come up during parole hearings unless it is somehow related to the offender's crime or else raised by the offender himself.

### D. Conclusion

Plaintiffs have not satisfied their burden on summary judgment of setting forth specific facts showing that the Board's practices amount to an establishment of religion as prohibited under the First Amendment. The court finds that the Board's policies are supported by a secular legislative purpose; neither advance nor inhibit religion; and, do not foster an excessive government entanglement with religion. Thus, the court concludes

that Defendant is entitled to summary judgment on Plaintiffs'
Establishment Clause claim.

### V. Equal Protection

#### A. Legal Standard

The Fourteenth Amendment states that "[n]o state shall . . .
deny to any person within its jurisdiction the equal protection
of the laws." U.S. Const. amend. XIV.  Put simply, the Equal
Protection clause requires that "all persons similarly
circumstanced shall be treated alike." *F.S. Royster Guano Co. v.
Virginia*, 253 U.S. 412, 415, 40 S. Ct. 560, 562 (1920).

The first step in evaluating any equal protection claim is
to determine the proper level of scrutiny applicable to the
challenged state practice.  A state practice that distinguishes
among classes of people will typically survive an equal
protection attack so long as the challenged classification is
rationally related to a legitimate governmental purpose. *Kadrmas
v. Dickinson Pub. Schs.*, 487 U.S. 450, 108 S. Ct. 2481, 2487
(1988).  However, strict scrutiny is applied if the challenged
state practice interferes with a "fundamental right" or
discriminates against a "suspect class" of individuals.  *Id.*

Although Plaintiffs' equal protection claim is based on a
theory that the Board's actions interfere with the fundamental
constitutional right to the free exercise of religion, the
Supreme Court has rejected attempts to invoke strict scrutiny by

19

alleging a free exercise violation as the basis for an equal
protection claim.  See *Locke v. Davey*, 540 U.S. 712, 124 S. Ct.
1307 (2004).  In *Locke*, the Supreme Court rejected a free
exercise challenge to a Washington statute that denied funding
for devotional theology instruction.  The plaintiff in *Locke*
asserted, in addition to a free exercise claim, a claim that the
alleged religious discrimination amounted to an equal protection
violation.  The Court, noting that it had already rejected the
plaintiff's free exercise argument, concluded that the remaining
equal protection claim was only entitled to rational-basis
scrutiny.  *Id.* at 721 n.3.  The First Circuit has reiterated the
Supreme Court's reasoning in *Locke* by saying that "if a
challenged program comports with the Free Exercise Clause, that
conclusion wraps up the religious discrimination analysis.  Thus,
rational basis scrutiny applies to any further equal protection
inquiry."  *Eulitt ex rel. Eulitt v. Maine, Dept. of Educ.*, 386
F.3d 344, 353-4 (1st Cir. 2004).

B. Equal Protection Analysis

To prevail on their equal protection claim, Plaintiffs must
show that the Board's actions are not rationally related to a
legitimate governmental purpose.  The initial burden on summary
judgment rests with Defendant, who must identify specific facts
in the record showing that there is a lack of evidence to support
Plaintiffs' allegations.  If Defendant satisfies this burden,

Plaintiffs must then come forward with admissible evidence showing a genuine issue of material fact.

To meet its initial burden, Defendant points to evidence in the record showing that any variations in its treatment and parole decisions--which Plaintiffs cite as evidence of religious bias--are actually the natural result of the Board's individualized review process, which focuses on the likelihood of an inmate re-offending if released on parole.  As Defendant points out, each inmate presents a unique set of characteristics relevant to this inquiry, including among other things, the inmate's criminal history, participation in therapy, acceptance of responsibility, history of substance abuse, prison behavior, and support system outside prison.  Because there are so many variables, Defendant argues that it is impossible to identify two inmates who are so similarly situated as to require identical treatment under the Constitution.

To further undermine Plaintiffs' claims, Defendant has also submitted extensive documentation regarding each Plaintiff's conviction, sentence, prison record, and treatment by the Board, as well as specific information regarding each of the non-party offenders whose cases Plaintiffs allege show preferential treatment by the Board.  Defendant points out specific factors relevant to each of these non-party offenders' cases which differentiate them from Plaintiffs' cases.  Thus, Defendant

asserts that Plaintiffs have not identified other offenders who were similarly situated to Plaintiffs but received more favorable treatment from the Board.

The court finds that Defendant has satisfied its burden of showing that there is an absence of evidence to support Plaintiffs' equal protection claim. Thus, to survive summary judgment Plaintiffs must present admissible evidence showing the existence of a genuine issue of material fact as to whether the Board purposefully discriminates on the basis of religion.

As previously discussed in Part III *supra*, the evidence presented by Plaintiffs is insufficient to make such a showing. Plaintiffs have not provided any evidence showing that the Board routinely considers inmates' religious affiliations or participation when making treatment or parole decisions. Although the record shows that religion may sometimes come up during the Board's detailed evaluation process--particularly if it is somehow relevant to the offender's crime--such tangential consideration of religion does not amount to a suspect classification for purposes of equal protection analysis.

Nor have Plaintiffs shown that the individualized assessment process itself amounts to a denial of equal protection. As this court noted in *Houtz v. Deland*, 718 F. Supp. 1497, 1501 (D. Utah 1989), "[t]he Constitution does not make it legally impossible for a state, in granting or refusing parole, to make an

individualized judgment in each case."  Instead, "individual scrutiny of prisoners rationally promotes the legitimate end of the state legislature in ensuring detailed evaluation of prisoners prior to their release." *Id.* at 1502.

### C. Conclusion

Because Plaintiffs have not met their burden of presenting "specific facts that would be admissible in evidence in the event of a trial" showing an equal protection violation, *see Adler v. Wal-Mart Stores, 144 F.3d 664, 671 (10th Cir. 1998)*, the court concludes that Defendant is entitled to summary judgment on Plaintiffs' equal protection claim.

### ORDER

Based on the foregoing analysis, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is **granted.**

BY THE COURT:

DATED this 7th day of December, 2006.

_Tena Campbell_
_____
Tena Campbell
United States District Judge